# EXHIBIT A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF SUFFOLK

----------------------------------------------------------------X

iOPTIMIZE REALTY INC. f/k/a DYSAL, INC.,

                            Plaintiff,

        -against-

COX ENTERPRISES, INC., COX AUTOMOTIVE, INC.,
MANHEIM INVESTMENTS, INC. and
DEALERTRACK INC.,

                           Defendant.

----------------------------------------------------------------X

**Index No:**
Date Filed: 7/16/2021

**SUMMONS**

Basis of Venue: Agreement

To the above-named Defendants:

    **YOU ARE HEREBY SUMMONED** to answer the complaint in this action and to serve a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of appearance, on the Plaintiff's Attorney(s) within 20 days after the service of this summons, exclusive of the day of service (or within 30 days after the service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

Dated: Ronkonkoma, New York
      July 16, 2021

                    **CAMPOLO, MIDDLETON
                    & McCORMICK, LLP**

                    By:_____
                        Patrick McCormick, Esq.
                        Jeffrey V. Basso, Esq.
                        *Attorneys for Plaintiff*
                        4175 Veterans Memorial Hwy, Suite 400
                        Ronkonkoma, New York 11779
                        (631) 738-9100

[1952-002/3483666]

**Defendants' Addresses:**

Cox Enterprises, Inc.
1111 Marcus Avenue, Suite M04
Lake Success, New York 11042

Cox Automotive, Inc.
3400 New Hyde Park Road
North Hills, New York 11040

Manheim Investments, Inc.
2000 Dealer Drive
Newburgh, New York 12550

Dealertrack, Inc.
3400 New Hyde Park Road
North Hills, New York 11040

2

[1952-002/3483666]

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF SUFFOLK

--------------------------------------------------------------------X

iOPTIMIZE REALTY INC. f/k/a DYSAL, INC.,                                    Index No:

                                                                            **VERIFIED COMPLAINT**

                              Plaintiff,

              -against-

COX ENTERPRISES, INC., COX AUTOMOTIVE, INC.,
MANHEIM INVESTMENTS, INC. and
DEALERTRACK INC.,

                              Defendants.

--------------------------------------------------------------------X

      Plaintiff iOptimize Realty Inc. f/k/a Dysal, Inc. ("iOptimize"), by and through its

attorneys Campolo, Middleton & McCormick, LLP, as and for its Complaint against Defendants,

COX ENTERPRISES, INC. ("Cox Enterprises"), COX AUTOMOTIVE, INC. ("Cox Auto"),

MANHEIM INVESTMENTS, INC. ("Manheim") and DEALERTRACK INC. ("DT

Inc")(collectively referred to as "Defendants" or "Cox Entities"), alleges as follows:

## NATURE OF THE CASE

      1.    Plaintiff iOptimize commences this action seeking to recover brokerage fees and

other related damages against the Cox Entities, jointly and severally, based upon an exclusive

brokerage agreement between iOptimize and non-party Dealertrack Technologies, Inc., formerly

known as Dealertrack Holdings, Inc. ("DT Technologies"), and the Cox Entities' status as

successors, assigns, affiliates and/or subsidiaries of DT Technologies who expressly and/or

impliedly assumed DT Technologies' liability and contractual obligations under the subject

brokerage agreement ("Brokerage Agreement") following a merger agreement in June 2015.

      2.    Beginning in or around June 2015, at or around the time of a public

announcement of DT Technologies' merger with one or more of the Cox Entities, the Cox

[1952-002/3483666]

Entities, jointly and severally, assumed absolute control of DT Technologies' real estate transactions with actual knowledge of the exclusive Brokerage Agreement between iOptimize and DT Technologies.

3.      The Cox Entities, jointly and severally, having assumed DT Technologies' contractual obligations under the exclusive brokerage agreement, intentionally breached and caused DT Technologies' breach of the agreement by conducting and controlling real estate transactions on behalf of and/or with the assistance of DT Technologies without compensating iOptimize for brokerage fees to which iOptimize was and remains entitled.

## PARTIES

4.      Plaintiff iOptimize is a domestic business corporation duly organized under the laws of the State of New York with its principal place of business located in Suffolk County.

5.      iOptimize was formerly known as Dysal, Inc. and did business under the trade name Corporate Realty Consultants.

6.      In or around October 2012, iOptimize changed its name to iOptimize Realty, Inc.

7.      Upon information and belief, Defendant Cox Enterprises is a foreign corporation duly incorporated in the State of Delaware with headquarters in the State of Georgia and locations throughout the United States, including on Long Island in Nassau County, New York.

8.      Upon information and belief, Defendant Cox Auto is a foreign corporation duly incorporated in the State of Delaware, authorized to do business in the State of New York, with headquarters in the State of Georgia and locations throughout the United States, including on Long Island in Nassau County, New York.

2

[1952-002/3483666]

9.      Upon information and belief, Defendant Manheim is a foreign corporation duly incorporated in the State of Nevada with headquarters in the State of Georgia and locations throughout the United States, including multiple locations in the State of New York.

10.      Upon information and belief, Defendant DT Inc. is a foreign corporation duly incorporated in the State of Delaware, authorized to do business in the State of New York and locations throughout the United States, including on Long Island in Nassau County, New York.

## JURISDICTION AND VENUE

11.      This Court has personal jurisdiction over each of the Defendants.

12.      Each of the Defendants has sufficient minimum contacts with the State of New York.

13.      Each of the Defendants regularly conducts business within the State of New York, maintains offices in New York and engages in substantial activity in New York.

14.      Each of the Defendants purposefully availed themselves of the privilege of conducting activities in New York and should reasonably anticipate being haled into court in the State of New York.

15.      Under the Brokerage Agreement, and as successor entities to DT Technologies, Defendants availed themselves of personal jurisdiction and venue in New York State in the courts of the County of Suffolk.

16.      Venue is also proper in Suffolk County, New York because Plaintiff maintains is principal place of business in Suffolk County.

[1952-002/3483666]

## BACKGROUND

17.     At all relevant times herein, iOptimize is and has been a licensed commercial real estate brokerage and consulting firm serving Fortune 500 clients throughout the United States, including New York.

18.     iOptimize holds real estate broker licenses in sixteen (16) states in the United States and, in any state or jurisdiction in which iOptimize does not hold a license, iOptimize utilizes sponsoring brokers and/or co-brokers who are licensed in any such state or jurisdiction which enables iOptimize to provide real estate brokerage services in all 50 states, as well as globally.

19.     Cox Enterprises is a global company with nearly 50,000 employees servicing the communications and automotive industries.

20.     Cox Auto is an affiliate or subsidiary of Cox Enterprises which handles the automotive division of Cox Enterprises.

21.     According to Cox Enterprises' and Cox Auto's websites, their "global brands" include Defendants Manheim and DT, Inc., both of which are divisions of Cox Enterprises and/or Cox Auto.

22.     Upon information and belief, Manheim serves as a division of Cox Enterprises and/or Cox Auto's inventory department providing, among other things, a wholesale automotive marketplace.

23.     Upon information and belief, DT, Inc. serves as a division of Cox Enterprises and/or Cox Auto's operations department as a leading provider of digital solutions to the automotive retail industry.

24.     Non-party DT Technologies was a foreign corporation formed in the State of Delaware that was authorized to do business in the State of New York through January 31, 2017 when it was declared an inactive entity.

**The Agreement and Amendments between iOptimize and Non-Party DT Technologies**

25.     On or about November 13, 2009, iOptimize and non-party DT Technologies entered into the written Brokerage Agreement.

26.     The Brokerage Agreement provides that iOptimize would serve as DT Technologies' exclusive real estate broker and iOptimize would perform a variety of services including, but not limited to, modeling DT Technologies' optimum site criteria, researching suitable alternative sites, compiling building data, creating a market survey report, performing lease analysis, creating requests for proposals, performing over or under market analysis, and other related services.

27.     The Brokerage Agreement at paragraphs 7 and 10 provides that iOptimize would serve as DT Technologies' exclusive broker for a period of twelve months and DT Technologies' agreed not to employ or use any other broker during the term of the Brokerage Agreement.

28.     The Brokerage Agreement defines the "Client" as "Dealertrack Holdings, Inc. and/or its affiliates or subsidiaries."

29.     The Brokerage Agreement, at paragraph 20, states that "This Agreement shall benefit and bind the parties hereto and their respective successors and assigns."

30.     The Brokerage Agreement provides at paragraph 6(A) that if DT Technologies leases a site during the term of the Brokerage Agreement, iOptimize would receive a brokerage fee of 5% of the gross rent for the term of the lease, or $15,000, whichever is higher ("Brokerage Fee").

31.     The Brokerage Agreement at paragraph 8, provides, "CRC [iOptimize] will offer the CLIENT [DT Technologies or its subsidiaries, affiliates, successors or assigns] SITES through their SiteSelectorPro or via: Printed Report, DVD or CD-ROM Report or email.  The CLIENT hereby agrees that if CLIENT leases or purchases any of the SITES so listed by CRC within twelve (12) months following the expiration of this Agreement, then CRC will be entitled to compensation in accordance with the terms and conditions of this agreement as if it was during the original term of the agreement."

32.     As set forth in paragraph 6 of the Brokerage Agreement, DT Technologies agreed to pay any portion of the earned Brokerage Fee that was not paid by landlord or seller "within 30 days of lease or sale contract execution."

33.     The Brokerage Agreement at paragraph 13 provides that the laws of the State of New York govern in the event of a dispute and venue would be in Suffolk County, New York.

34.     The Brokerage Agreement at paragraph 16 provides that, "[i]n the event of any dispute, the prevailing party shall be entitled to recover costs including, but not limited to, reasonable attorneys' fees."

35.     The Brokerage Agreement was subsequently amended on January 5, 2012, April 22, 2013, and November 19, 2013.

36.     As it relates to iOptimize's exclusive Brokerage Agreement with DT Technologies, its subsidiaries, affiliates, successors and assigns, the subsequent amendments to the Brokerage Agreement extended the term of the exclusive Brokerage Agreement through April 22, 2016 and expanded the geographical scope of the exclusivity of the Brokerage Agreement to all properties, wherever the property is located.

6

[1952-002/3483666]

37.    The subsequent amendments to the Brokerage Agreement, including the amendment that extended the term of the Brokerage Agreement through April 22, 2016, continued to refer to "Client" as "Dealertrack Holdings, Inc. and/or its affiliates or subsidiaries."

38.    The final amendment to the Brokerage Agreement, which dealt primarily with economic incentives also noted that, "This document amends the terms of the existing agreement between iOptimize Realty, Inc. (IOPTIMIZE REALTY) and Dealertrack Technologies (CLIENT) as follows:" and goes on to state that iOptimize was the "exclusive real estate broker and INCENTIVES consultant (defined below) for CLIENT for all properties, wherever the property is located."

**DT Technologies Merges with and is Acquired by the Cox Entities**

39.    According to public filings with the Securities and Exchange Commission ("SEC"), beginning in June 2013, Sandy Schwartz (then Chief Executive Officer of Cox Auto) and Mark O'Neil (then Chief Executive Officer of DT Technologies) began discussions about a potential future transaction involving one or all of the Cox Entities and DT Technologies.

40.    The discussions about a possible transaction involving one or more of the Cox Entities and DT Technologies continued in mid-2014, with meetings at DT Technologies' corporate headquarters on Long Island, New York between Cox representatives, including Mr. Schwartz and Chief Financial Officer Dallas Clement and DT Technologies' representatives including Mr. O'Neil and then Executive Vice President Raj Sundaram.

41.    Following further discussions in January 2015 between the Cox Entities and DT Technologies' representatives and management at the National Auto Dealers Association conference, Mr. Schwartz met again with Mr. O'Neil in or around February 2015, and reiterated the Cox Entities' interest in acquiring DT Technologies.

7

[1952-002/3483666]

42.     On March 5, 2015, Mr. O'Neil went to Georgia and met with Mr. Schwartz, as well as John Dyer, the President of Cox Enterprises and other members of the Cox Entities to discuss DT Technologies' business and potential acquisition.

43.     On March 16, 2015, Mr. Schwartz, on behalf of Cox Auto, made a proposal to Mr. O'Neil, on behalf of DT Technologies, to acquire all the outstanding shares of DT Technologies.

44.     On May 20, 2015, following additional negotiations regarding the stock purchase of DT Technologies in the preceding months, Mr. O'Neil and Eric Jacobs, (DT Technologies' then Executive Vice President and Chief Financial and Administrative Officer), went to Dallas, Texas and met with Mr. Schwartz, Mr. Clement and Joseph Luppino, (Senior Vice President and Chief Corporate Development Officer of Cox Auto) to further discuss the acquisition of DT Technologies.

45.     On May 31, 2015, following an improved proposal from Cox Auto, the Board of Directors of DT Technologies held a meeting during which they deliberated over the proposal from Cox Auto and evaluated the positives and negatives of proceeding with the transaction as well as not proceeding and keeping DT Technologies as a stand-alone company.

46.     After further negotiations, another meeting was held with the DT Technologies' Board on June 2, 2015 whereby the terms of Cox Auto's proposal were accepted by the Board.

47.     Also on June 2, 2015, Cox Auto and DT Technologies entered into a Confidentiality Agreement pertaining to, among other things, the exchange of documents and information and conducting due diligence for purposes of the transaction.

48.     By June 3, 2015, a draft merger agreement was circulated between counsel for Cox Auto and DT Technologies.

8

49.     Additional negotiations about the terms of the merger agreement continued through the beginning of June 2015 and, on June 11, 2015, the Board of DT Technologies met to consider the merger agreement.

50.     At the June 11, 2015 Board meeting, the Board again reviewed DT Technologies' prospects of remaining a stand-alone entity, and unanimously voted to approve the merger agreement.

51.     On June 15, 2015, still ten months before the termination of the exclusive brokerage agreement between iOptimize and DT Technologies, Cox Auto and DT Technologies publicly announced the $4 billion merger transaction.

52.     On June 26, 2015, Eric Jacobs, on behalf of DT Technologies filed or caused to be filed a Solicitation/Recommendation Statement with the SEC documenting, among other things, the approval of the merger and summarizing the merger agreement and history of the transaction.

53.     On September 29, 2015, the U.S. Department of Justice commenced an antitrust civil action under Section 15 of the Clayton Act in the U.S. District Court for the District of Columbia against Cox Enterprises, Cox Auto and DT Technologies pertaining to the acquisition of DT Technologies by Cox Enterprises and Cox Auto.

54.     A subsequent Agreement and Plan of Merger dated October 26, 2016 was entered into between Cox Auto, Manheim and DT Technologies.

55.     The Agreement and Plan of Merger was executed by the same person, Mary Vickers, as Vice President of all three entities.

56.     The Agreement and Plan of Merger stated that DT Technologies was merging into Manheim with Manheim being the "Surviving Corporation" and DT Technologies being the "Disappearing Entity."

57.     Pursuant to the Agreement and Plan of Merger, shares of DT Technologies owned by Cox Auto were cancelled and Defendant Manheim assumed all liabilities of DT Technologies identified in Exhibit "A" of the Agreement and Plan of Merger, with any other liabilities of DT Technologies being assumed by Defendant DT, Inc.

58.     Exhibit "A" of the Agreement and Plan of Merger does not expressly identify the Agreement between iOptimize and DT Technologies.

59.     A Certificate of Merger dated October 26, 2016 filed with the Delaware Secretary of State, executed by Mary Vickers as "Authorized Officer," identifies the merger between DT Technologies and Manheim, with Manheim being the surviving entity.

60.     Articles of Merger were also filed with the Nevada Secretary of State on March 23, 2017, again signed by Mary Vickers on behalf of both DT Technologies and Manheim, identifying DT Technologies as the merging entity and Manheim as the surviving entity.

61.     A Certificate of Termination of Existence of DT Technologies was filed with the New York Department of State on January 31, 2017.

**The Cox Entities Assume Control of All Real Estate Transactions for DT Technologies**

62.     Following DT Technologies' approval of the merger agreement with Cox, the Cox Entities became inextricably intertwined in and controlled all DT Technologies' real estate transactions.

63.     In that regard, in an email dated August 4, 2015 (approximately eight months before the end of the exclusive Brokerage Agreement between iOptimize and DT Technologies),

10

from Matthew Bekerman, Associate General Counsel for DT Technologies, to Randy Henrick, also Associate General Counsel of DT Technologies at the time, Mr. Bekerman stated that all "Company Leases," meaning any agreement under which DT Technologies "uses, occupies or has the right to use or occupy any real property" "requires prior approval by Cox."

64. The term "Company Leases" also includes properties also used or occupied by the Cox Entities.

65. Mr. Henrick then followed up the email from Matthew Bekerman with an email dated August 4, 2015 to others at DT Technologies as well as iOptimize, stating, in part, "It looks like Cox has to approve whatever we do with leasing space."

66. Since at least August 4, 2015 through the termination of the Agreement on April 22, 2016 and thereafter, Anne Lofye, the Vice President of Real Estate for Cox Enterprises regularly corresponded with and directed and controlled DT Technologies' real estate personnel as to leasing transactions including DT Technologies.

67. Anne Lofye has also acknowledged in sworn court documents that her responsibilities include maintaining business records related to lease transactions that Cox Enterprises and its subsidiaries, including DT Technologies, enter into during the course of their operations.

68. Anne Lofye was directly responsible for and did negotiate and execute lease documents in her role with Cox Enterprises on behalf of DT Technologies since June 2015, and prior to the termination of the Brokerage Agreement on April 22, 2016, and also during the one-year "tail" provision following the termination of the Brokerage Agreement.

69. Another employee of Cox Enterprises, Senior Transaction Manager Leslie Claxton, stated in a letter dated May 16, 2016 to a landlord entity in Georgia that, "In October

11

[1952-002/3483666]

2015 Cox Enterprises, Inc. acquires Dealertrack Technologies. Dealertrack is now a private subsidiary under Cox Automotive, Inc."

70.     The subject line of the May 16, 2016 letter from Leslie Claxton was "Acquisition of DealerTrack Technologies by Cox Enterprises, Inc. and Ms. Claxton specifically directed all future notices regarding the DT Technologies' lease to Cox Enterprises.

71.     In addition to the above, several employees of the real estate brokerage company CBRE work in-house as brokers for the Cox Entities and have directly worked on and directed DT Technologies' real estate transactions.

72.     In an email between Anne Lofye and Michael Fex (DT Technologies' former Senior Director of Real Estate and Facilities) from October 22, 2015, the two specifically discussed whether the Cox Entities and DT Technologies would "combine" offices in Toronto, Canada.

73.     As highlighted by the examples above, since at least August 4, 2015, real estate transactions by the Cox Entities and DT Technologies overlapped in terms of personnel, leasing, and office use, including several real estate transactions completed prior to the termination of the Brokerage Agreement and/or within the one year "tail" period in the Brokerage Agreement.

74.     As further evidence of the assumption of control over DT Technologies by the Cox Entities, Cox Enterprises, through its Treasury Manager Jemal Webb, provided a Letter of Credit on November 20, 2015 totaling over $15 million to the landlord on behalf of DT Technologies to cover non-structural tenant improvements at DT Technologies' new corporate headquarters at 3400 New Hyde Park Road, North Hills, New York ("3400 NHPR").

12

[1952-002/3483666]

75. Mr. Webb, as Treasury Manager for Cox Enterprises, directly corresponded and negotiated the letter of credit with the landlord of 3400 NHPR and completed and submitted required forms from the lenders.

76. Additionally, the Amended Lease between DT Technologies and the landlord for 3400 NHPR, at Section 10.01, specifically noted that DT Technologies would be transferring its interest in the Amended Lease to Cox Auto as a "Permitted Transfer."

77. Upon information and belief, the Cox Entities assumed lease obligations of DT Technologies at many other locations in addition to 3400 NHPR.

78. Upon information and belief, the Cox Entities, any or all of them, assumed the debts of DT Technologies.

79. In a separate litigation, entitled *iOptimize Realty Inc. f/k/a Dysal, Inc. v. Dealertrack Technologies, Inc. f/k/a Dealertrack Holdings, Inc.* (Suffolk County Index No. 7646/2015)("Action #1"), which involved iOptimize's contractual claims for certain fees owed under the Brokerage Agreement by DT Technologies as a result of economic incentives obtained by iOptimize for DT Technologies at 3400 NHPR, Cox Auto tendered payment under CPLR 3219 on November 16, 2017 in the amount of $6,300,000.00 on behalf of DT Technologies to resolve Action #1, which was accepted by iOptimize.

80. In another litigation, entitled *iOptimize Realty Inc. f/k/a Dysal, Inc. v. Dealertrack Technologies, Inc. f/k/a Dealertrack Holdings, Inc.* (Suffolk County Index No. 607403/2016)("Action#2") which, among other things, involved iOptimize's claims to recoup brokerage fees from DT Technologies that were not paid to iOptimize in violation of the Brokerage Agreement, Cox Auto again tendered payment under CPLR 3219 on November 16, 2017 in the amount of $3,700,000.00 to resolve Action #2, which was not accepted by iOptimize.

13

81.     The Cox Entities, jointly and severally, are and have been since the merger agreement in June 2015, at minimum, successors and/or assigns of DT Technologies as it pertains to real estate transactions completed given the acquisition and the control exerted by the Cox Entities over all DT Technologies' real estate transactions since that time.

82.     As stated above, the Brokerage Agreement includes and is binding upon DT Technologies, as well as its affiliates and subsidiaries, and also its successors and assigns, which would include the Cox Entities.

**The Cox Entities Breached the Agreement and Aided and Abetted DT Technologies in Breaching the Agreement**

83.     Since at least August 4, 2015, the Cox Entities breached and assisted DT Technologies in breaching the Brokerage Agreement by completing real estate leasing transactions in circumvention of the exclusive brokerage agreement with iOptimize and without compensating iOptimize for such transactions.

84.     Despite the fact that the Brokerage Agreement provides that iOptimize was to serve as the exclusive broker for DT Technologies, it subsidiaries, affiliates, successors and assigns in connection with any leasing transaction, the Cox Entities either directly or on behalf of DT Technologies breached the exclusive broker terms of the Brokerage Agreement by completing numerous leasing transactions for various DT Technologies' sites and Cox Entity sites without iOptimize's knowledge and without paying iOptimize the contractually agreed upon 5% brokerage fee for each such transaction.

85.     Upon information and belief, the Cox Entities, as subsidiaries, affiliates, successors and/or assigns of DT Technologies, also completed leasing or purchase transactions following the expiration of the Brokerage Agreement that they began prior to the expiration of

14

[1952-002/3483666]

the Brokerage Agreement that would fall under the scope of the Brokerage Agreement entitling iOptimize to further brokerage fees.

86.     To date, iOptimize has learned of several leasing transactions completed in circumvention of the exclusive terms of the Brokerage Agreement by the Cox Entities, including but not limited to:

     a.  Memphis, Tennessee;

     b.  Fort Myers, Florida;

     c.  Edmond, Oklahoma;

     d.  Alpharetta, Georgia;

     e.  Lafayette, Louisiana;

     f.  Edison, New Jersey;

     g.  Baton Rouge, Louisiana;

     h.  East Greenbush, New York;

     i.  Amhurst, New Hampshire (collectively "Leasing Transactions").

87.     In addition to the Leasing Transactions above that were completed in circumvention of the exclusive Brokerage Agreement with iOptimize, there are many additional leasing and purchase transactions that were completed by the Cox Entities or under the control of the Cox Entities on behalf of DT Technologies for which the Cox Entities are liable to iOptimize.

## AS AND FOR A FIRST CAUSE OF ACTION
(Breach of Contract)

88.     Plaintiff repeats, reiterates and re-alleges each and every allegation set forth above with the same force and effect as if more fully set forth at length herein.

89.     By virtue of the Brokerage Agreement, iOptimize and DT Technologies entered into an enforceable contract.

90.   The Cox Entities had knowledge of the Agreement and its terms since at least June 2015.

91.   The Brokerage Agreement has clear and unequivocal terms, was made for consideration and accepted by iOptimize and DT Technologies.

92.   The terms of the Brokerage Agreement bound not only DT Technologies, but also its subsidiaries, affiliates, successors and assigns.

93.   Based upon the facts set forth above, the Cox Entities, jointly and severally, expressly or impliedly assumed DT Technologies' liability under the Brokerage Agreement by virtue of the merger agreement and control exercised over all DT Technologies' real estate transactions beginning since at least August 4, 2015.

94.   Based upon the facts set forth above, there was a consolidation or merger of DT Technologies into one or more of the Cox Entities, by which DT Technologies ceased to exist, but the business continued under the Cox Entities.

95.   Since at least August 4, 2015, the Cox Entities engaged in conduct that expressly or impliedly demonstrated their intent, jointly and severally, to pay DT Technologies' debts and contractual obligations or otherwise assume its liabilities.

96.   Since at least August 4, 2015, the Cox Entities, jointly and severally, expressly or impliedly assumed the liabilities of DT Technologies that would have ordinarily been necessary for the continued operation of the business of DT Technologies.

97.   Despite the cessation of business by DT Technologies following the merger, there has been a continuity of ownership, management, personnel, physical office locations, assets and general business operations, all of which were assumed by the Cox Entities.

98.     Pursuant to the Brokerage Agreement, and as a successor, assign, subsidiary and/or affiliate of DT Technologies, the Cox Entities, jointly and severally, are liable under the terms of the Brokerage Agreement for any leasing transactions the Cox Entities completed since August 2015 through the termination of the Brokerage Agreement on April 22, 2016 and thereafter through the one-year "tail" provision in the Brokerage Agreement following termination that were in violation and circumvention of the exclusive terms of the Brokerage Agreement.

99.     Pursuant to the Brokerage Agreement, and as a successor, assign, subsidiary and/or affiliate of DT Technologies, the Cox Entities, jointly and severally, are liable under the terms of the Brokerage Agreement for any leasing transactions completed by DT Technologies in violation and circumvention of the terms of the Brokerage Agreement, including but not limited to, the Leasing Transactions.

100.     The Cox Entities, as successors, assigns, subsidiaries and/or affiliates of DT Technologies breached the Brokerage Agreement by failing and refusing to pay to iOptimize the brokerage fees owed on the Leasing Transactions and many other transactions which have not yet been identified.

101.     iOptimize has not waived any portion of the brokerage fees owed on the Leasing Transactions and any other lease or purchase transactions that were entered into by DT Technologies and/or the Cox Entities that fall within the scope of the Brokerage Agreement.

102.     iOptimize has performed and satisfied all its obligations under the Brokerage Agreement.

17

[1952-002/3483666]

103.     As result of the foregoing, iOptimize has been damaged in an amount to be determined at trial but believed to be at least $1,000,000.00, plus attorneys' fees, pre-judgment interest, and costs.

## AS AND FOR A SECOND CAUSE OF ACTION
### (Unjust Enrichment)

104.     Plaintiff repeats, reiterates and re-alleges each and every allegation set forth above with the same force and effect as if more fully set forth at length herein.

105.     By virtue of the facts set forth above, the Cox Entities have been unjustly enriched as they have and will continue to receive the benefits of the leasing and purchase transactions, they and DT Technologies completed in violation of the Brokerage Agreement.

106.     The principles of equity and good conscience dictate that the Cox Entities not be permitted to retain the benefits of such leasing and purchase transactions without paying to iOptimize the brokerage fees to which it is entitled.

107.     As a result of the foregoing, the Cox Entities are liable to iOptimize for unjust enrichment in an amount to be determined at trial but believed to be at least $1,000,000.00, plus attorneys' fees, pre-judgment interest, and costs.

**WHEREFORE**, Plaintiff iOptimize respectfully demands judgment against Defendants, jointly and severally, as follows:

a)     on its First Cause of Action, in an amount to be determined at trial but believed to be at least $1,000,000.00, plus attorneys' fees, pre-judgment interest, and costs;

b)     on its Second Cause of Action, in the amount of $1,000,000.00, plus attorneys' fees, pre-judgment interest, and costs;

18

[1952-002/3483666]

c)     together with such other, further and different relief as to the Court deems just and

equitable.

Dated: Ronkonkoma, New York
        July 16, 2021

**CAMPOLO, MIDDLETON
& McCORMICK, LLP**

By:_____

Patrick McCormick, Esq.
Jeffrey V. Basso, Esq.
*Attorneys for Plaintiff*
4175 Veterans Memorial Highway
Suite 400
Ronkonkoma, New York 11779
Phone:  (631) 738-9100
Fax: (631) 738-0659

19

<u>**VERIFICATION**</u>

STATE OF NEW YORK)
                ) ss:
COUNTY OF SUFFOLK)

DONALD C. CATALANO, being duly sworn, deposes and says

    I am the President of iOptimize Realty, Inc. f/k/a Dysal, Inc., the Plaintiff in the within

action.

    I have read the foregoing Complaint and know the contents thereof based upon my

firsthand knowledge of the transactions and documents at issue and a review of the files

maintained by my office; the same is true to my own knowledge, except as to the matters therein

stated to be alleged on information and belief, and as to those matters I believe it to be true.

    This verification is made by me because the above party is a corporation and I am an

officer thereof.

                                  DONALD C. CATALANO

Sworn before me this
/_/ day of July, 2021

    Notary Public

KAREN CAMBRIA
NOTARY PUBLIC-STATE OF NEW YORK
No. 01CA6265413
Qualified In Suffolk County
My Commission Expires July 09, 2024

[1952-002 3566177]